2024 IL App (2d) 230076-U
No. 2-23-0076
Order filed November 14, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| FOUNTAIN SQUARE ON THE RIVER CONDOMINIUM ASSOCIATION, LTD., an Illinois not-for-profit corporation, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 17-L-301 |
| | ) | |
| FIRST AMERICAN BANK, FIRST AMERICAN BANK, as Trustee under that certain trust agreement dated August 19, 2009, and known as Trust No. 1-09-124, JOHN OLSEN, JAMES BERTON, JOHN M. LEE, DIANE HEITKEMPER, and AMERICAN REAL ESTATE INVESTMENTS NO. 4, LLC, | ) ) ) ) ) ) ) ) ) ) | |
| | ) | Honorable |
| | ) | Robert K. Villa, |
| Defendants-Appellees. | ) | Judge, Presiding. |
| | ) | |
| (RSC-ELGIN, LLC, an Illinois limited liability company, NOVAK CONSTRUCTION COMPANY, an Illinois corporation, RICHARD CURTO, JARED MARGOLIS, REIS KAYSER, Defendants) | ) ) ) ) ) ) | |
| | ) | |

_____

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Schostok concurred in the judgment.
Justice Kennedy dissented in the judgment.

**ORDER**

¶ 1    *Held*:    The trial court did not err in dismissing plaintiff's second amended complaint after finding that defendants properly raised the affirmative matter of the business judgment rule to defeat plaintiff's claims. The trial court did not err in finding that plaintiff failed to rebut defendants' evidence that the business judgment rule barred its claims.

¶ 2    Plaintiff, Fountain Square on the River Condominium Association, appeals from the trial court's dismissal, with prejudice, of its second amended complaint's claims sounding in fraud, consumer fraud, and breach of fiduciary duty against defendants pursuant to section 2-619(a)(9) (735 ILCS 5/2-619(a)(9) (West 2020) of the Code of Civil Procedure (the Code).[1] Plaintiff contends that the trial court (1) improperly considered defendants' argument as to the business judgment rule as an affirmative matter; (2) erred in finding that defendants' section 2-619(a)(9) motion conclusively defeated the facts articulated in plaintiff's second amended complaint; (3) incorrectly concluded that plaintiff failed to rebut defendant's evidence that the business judgment rule barred its claims; and (4) abused its discretion in granting defendant's motion to dismiss plaintiff's second amended complaint with prejudice.

---

[1] On November 17, 2017, RSC-Elgin, LLC, Richard Curto, Jared Margolis, and Reis Kayser's (collectively "RSC defendants") filed a motion to dismiss claims brough against them in plaintiff's complaint pursuant to section 2-615 of the Code. The trial court granted the RSC defendants' motion on April 9, 2018. On December 14, 2018, Novak Construction Company (Novak) filed a motion to dismiss claims brought against it in plaintiff's complaint pursuant to section 2-619 of the Code. On February 22, 2019, plaintiff filed a motion to voluntarily dismiss Novak. On March 12, 2019, the trial court granted plaintiff's motion and dismissed Novak as a party defendant with prejudice. Novak's motion to dismiss was withdrawn as moot.

¶ 3                                    I. BACKGROUND

¶ 4     In 2005, RSC-Elgin entered into a construction loan agreement with First American Bank to finance the building and development of a 93-unit residential condominium building in Elgin. RSC-Elgin retained Novak Construction Company (Novak) as its general contractor to develop the building. RSC-Elgin and Novak engaged in ongoing disputes over certain construction defects to the building between 2005 and 2008. On October 21, 2008, Novak filed a suit in Kane county to foreclose on a mechanic's lien filed against RSC-Elgin after it failed to pay money owed to Novak.

¶ 5     On June 23, 2009, RSC-Elgin, First American Bank, and Novak entered into a settlement agreement and release of the mechanic's lien. In the agreement, RSC-Elgin agreed to pay Novak $775,000 in three separate installments. The first payment of $250,000 was to be made upon Novak's dismissal of its mechanic's lien action in Kane County. The second payment of $250,000 was to be made upon Novak's "substantial completion" of all work set forth in a "punch list." The agreement defined "substantial completion" to mean that "all work recorded on the punch list has been completed except for minor or inconsequential details of construction      ***." The third payment of $275,000 was to be made upon

> "(a) Novak's final completion of all (100%) of the work set forth in the Punch List, (b) inspection and approval by RSC-Elgin and its lender, First American Bank, to confirm completion of all such work, which approval shall not be unreasonably withheld, and (c) an unqualified certification from Wiss, Janney, Elstner Associates, Inc. (Wiss Janney) that all causes of water infiltration causing leaks in the building and all (100%) of the work set forth in the Punch List have been corrected."

¶ 6       On July 2, 2009, Wiss Janney Principal, Joseph Godfryt, provided First American Bank Assistant Vice President, John Lee, with a memorandum in response to the building's repair work proposed by Novak "to eliminate water leakage at the roof to wall balcony condition at the 8th floor of the *** property[,]" and read as follows:

        "a. Barrier Wall design:

        It is critical to understand that by design, the barrier wall system at this property relies solely on the integrity of exterior sealant to keep the building watertight. With that in mind, any joint defect (including minor joint installation errors) is a candidate as a source for water entry. This includes the wall system as well as the north parking deck area atop the underground garage. In our opinion, this equates to an anticipated watertight performance expectation of 7 to 12 years, as the in-place sealant will deteriorate and fail due to normal weathering at some point within that time frame. Consideration must also be given to the substrates to which the sealant is applied. At the balcony, concrete is a porous material and can allow for the infiltration of moisture under the perimeter sealant, which may be contributing to the recent leak issues. [Wiss Janney] typically recommends the inherent redundancy provided by a flashing and/or rainscreen design approach for the exterior building enclosure design. The water entry problems that are occurring at this property are typical of those associated with barrier wall designs and they include installer errors and sealant adhesion defects.

        b. Long Term Durability:

        Although Novak Construction seems to be certain that the source of the leakage at the upper corner units (west elevation) is the result of defective sealant at the balcony-to-wall interface, [Wiss Janney] cannot "endorse" their proposed sealant joint replacement

repair. [Wiss Janney] did not perform field water testing at the as-built installation to conclusively identify that this is a single-source leak problem. It is possible that the window assembly and/or the adhered EPDM deck membrane, or interfaces between these components is also defective and if that is the case, leakage will re-occur. Note that in the field opening made by Novak, there was no visual evidence of water staining or corrosion on the steel stud wall framing. This absence of visible corrosion would normally be expected at a location that has been an active leakage source for any extended period of time. Based upon our experience the absence of such visible staining suggests that the proposed repair area may not be the only water path that exists at this location.

c. Constructability of Repairs:

If Novak is correct and the defective corner (which was opened in our last site visit) is in fact the sole source of current leakage, it is critical to understand that such a sealant repair approach will likely not result in what we would define as a permanent solution to the problem. We are not sure why the whole area of EIFS was removed if in fact the only area believed to be a problem was the sealant joint. The balcony design, inclusive of the actual drainage path in relation to the extremely narrow balcony width is such that it poses significant constructability issues in terms of developing a permanent watertight solution to the problem.

It is my understanding that Novak has proceeded with repair activity as described in their recent email. Assuming that repairs were performed this week, we suggest that the materials be allowed to fully cure (for a one week minimum period) followed by re-testing to confirm watertight performance.

In the event that water leakage continues to occur, [Wiss Janney] will be available to provide a comprehensive repair approach to the problem. In the interim, we will proceed with our written summary statements with respect to the garage leakage issues, ceiling finish cracks, as well as our related recommendations towards resolving all major water entry issues at the property."

¶ 7 On July 20, 2009, Godfryt emailed to Lee a proposal detailing Wiss Janney's plan to determine "if sealant joint repair and replacement work that is currently being performed [by Novak] has corrected water entry problems at the west portion of the building." Godfryt's email detailed the following proposed services:

"1. Visual inspection of the entire west elevation will be performed. Close-up inspections will be performed via a portable man lift. All inspection observations will be graphically and photographically recorded. These inspections will include:

a. Precast concrete sealant joints

b. Perimeter window sealant joints

c. Balcony waterproofing

2. Field Testing: Field water testing will be performed at all units on the west elevation of the building that have experienced leakage as evidenced by interior finish staining. Per our past interior inspections we assume that this represents at least one window opening in each of the west elevation units at both the north and south sides of the building. A portable man lift will be used to gain close-up access for our field personnel. We will employ both calibrated water nozzle as well as water spray rack procedures to complete this testing. Where interior occurs [*sic*], we will attempt to trace the water entry

path (as accurately as possible) to confirm if the source of water entry is defective sealant or an inherent defect in the window assembly.

3. Upon completion of all field testing tasks we will prepare and submit a written report of our findings. Our report will include a discussion of all pertinent design and construction issues related to past water entry concerns."

Lee responded to Godfryt's proposal later that day by remarking that "[t]he Bank approves your proposal[.]"

¶ 8    On August 19, 2009, First American Bank acquired full ownership and interest in the building pursuant to a Deed in Lieu of Foreclosure executed by RSC-Elgin following its default on the construction loans. The conveyance was made via a trust agreement wherein First American Bank named American Real Estate Investments No. 4, LLC (AREI), an entity created by First American Bank, the sole beneficiary. AREI assumed the role of successor developer of the building. First American Bank directed AREI to execute an "ACTION BY WRITTEN CONSENT OF THE BOARD OF DIRECTORS OF FOUNTAIN SQUARE ON THE RIVER CONDOMINIUM COMMERCIAL ASSOCATION, LTD.[,]" wherein John Olsen, James Berton, and John M. Lee, all employees of First National Bank, were appointed to the board of managers. 58 of the building's 93 units remained unsold at the time of the conveyance.

¶ 9    Following several months of testing for watertightness at the building, Godfryt sent the following email to Lee on December 22, 2009:

"This letter is intended to summarize our visual inspection observations and subsequent discussions with Novak Construction during our site meeting on December 7, 2009. Briefly reiterating, subsequent to submittal of our façade water testing summary report dated September 9, 2009, Novak Construction proceeded with additional field

testing and subsequent window leakage repairs at all "07" and "08" units (north, west, and south windows) as well as the defective east wall window at unit 702. The scope of repairs as developed by Novak included the following remedial work:

· All fixed lites [*sic*] at all window units were re-sealed from the exterior.

· All displaced surface mullion joinery was sealed from the exterior.

· All window units were completely re-tested by Novak Construction. [Wiss Janney] was present during portions of re-testing procedures. Novak Construction maintained and submitted field test logs for review.

· The east wall coping atop the window leak in unit 702 received a new sheet metal coping, and the area was also re-tested by Novak.

As of our December 7th visual inspection, to the best of our knowledge, all active leaks have been addressed. Per the repairs and re-testing recently performed by Novak Construction, all windows at the "07" and "08" units, as well as the window at 702 east now appear to demonstrate watertight performance.

The corrective work attributed to previous exterior sealant and window deficiencies at Fountain Square appears to now provide watertight performance. We consider our role in this project now complete."

First American Bank released the third installment payment of $275,000 to Novak.

¶ 10    In May 2010, the board of managers, on the recommendation of then-newly retained property management company Braeside Condominium Management, Ltd. (Braeside), approved the retention of Building Reserves, Inc. (BRI) to inspect the building and issue a report to "assist the board in fulfilling its legal and financial obligations of keeping the community in an economically manageable state of repair." The report was further commissioned as "a budget-

planning tool that identifies the current status of reserve fund and a stable and equitable Reserve Funding Plan to offset the anticipated major-common area expenditures." On July 28, 2020, BRI submitted its 80-page "2010 Reserve Study" to the board. In the report, BRI projected that replacement of all of the caulking surrounding the windows of the building would need to be performed in 2017, 2027, and 2037 to properly guard against water infiltration.

¶ 11    On November 18, 2010, control of the Fountain Square on the River Condominium Commercial Association, as well as control over the common areas of the building, was turned over to a board of directors elected from the unit owner membership. Olsen and Lee remained on the board, but Berton was replaced by Diane Heitkemper, an employee of First American Bank.

¶ 12    On October 10, 2014, First American Bank sold its interest in the building's remaining 58 residential units, two commercial condominium units, and 72 parking spaces to Northhampton Group Ltd. (Northhampton), a Canadian entity owned by Ken Campbell for $5,600,000. The building was sold to Northhampton "as is." Paragraph 14 of the contract of sale read, in part, as follows:

>    "PURCHASER ACKNOWLEDGES THAT SELLER (OR ITS BENEFICIARY) ACQUIRED THE PREMISES OR BY WAY OF DEED IN LIEU OF FORECLOSURE AND THAT SELLER (OR ITS BENEFICIARY) HAS HAD NO INVOLVEMENT IN THE DEVELOPMENT, ENTITLEMENT OR CONSTRUCTION OF THE PREMISES. NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN CONTAINED, PURCHASER EXPRESSLY UNDERSTANDS, ACKNOWLEDGES AND AGREES THAT THE CONVEYANCE OF THE PREMISES SHALL BE MADE BY SELLER TO PURCHASER ON AN "AS IS, WHERE IS" BASIS, AND "WITH ALL FAULTS," AND PURCHASER ACKNOWLEDGES THAT PURCHASER HAS AGREED TO BUY THE

PREMISES IN ITS PRESENT CONDITION (SUBJECT TO PURCHASER'S RIGHT OF INSPECTION AND REVIEW AS PROVIDED HEREIN) AND THAT PURCHASER IS RELYING SOLELY ON ITS OWN EXAMINATION AND INSPECTIONS OF THE PREMISES AND NOT ON ANY MATERIAL OR INFORMATION *** FURNISHED OR STATEMENTS OR REPRESENTATIONS MADE, BY SELLER OR ANY AGENTS OR REPRESENTATIVES OF SELLER, EXCEPT AS OTHERWISE SPECIFICALLY SET FORTH HEREIN."

At the time of the sale, Fountain Square on the River Condominium Commercial Association had over $300,000 in total reserve funds. After the sale, Fountain Square on the River Condominium Association (plaintiff) was formed, and a new board of managers was elected after the sale. Plaintiff kept Braeside Condominium Management as its property management company.

¶ 13    In 2015, residents reported water leaks to plaintiff. In March 2016, plaintiff contacted Wiss Janney to provide services to the building. First American Bank executed conflict waiver, signed by Lee, waiving any conflict related to First American Bank's retention of Wiss Janney in 2009. The conflict waiver specified that plaintiff had "been provided access to any information available regarding [Wiss Janney's] work including all written documents and the opportunity to fully interview [Wiss Janney]."

¶ 14    Plaintiff hired a consultant, Kellermeyer Godfryt Hart (KGH) to investigate the cause of the water leaks. KGH informed Braeside President David Multack that the building needed repairs and replacements to correct design and construction defects in the barrier walls and balconies, including the eighth floor EIFS wall. Additionally, KGH later informed plaintiff that the perimeter window sealant showed "widespread" adhesion failure at the balcony door and window assemblies. Prior sealant repairs had unbonded from the surface of the application. KGH

recommended "abandoning the existing system" in favor of a new installation to promote drainage from the wall. Plaintiff estimated the total cost to repair the building's defects to exceed $1,700,000.

¶ 15    In March 2016, plaintiff contacted Wiss Janney to provide services to the building. First American Bank executed the conflict waiver and was signed by Lee. The conflict waiver specified that plaintiff had "been provided access to any information available regarding [Wiss Janney's] work including all written documents and the opportunity to fully interview [Wiss Janney]."

¶ 16    On November 21, 2018, plaintiff filed its 17-count[2] second amended complaint at law and jury demand (complaint). Plaintiff alleged that defendants breached their fiduciary duties by failing to address window defects in the building (counts 1, 2, 3, 14, 15). The breach of fiduciary duty counts also alleged constructive fraud. Additionally, plaintiff alleged that defendants violated the Illinois Consumer Fraud Act (815 ILCS 505/2 (West 2018)) and committed common law fraud by failing to set adequate reserves for the building's repairs (counts 16 and 17).

¶ 17    Defendants filed a motion to dismiss plaintiff's complaint pursuant to section 2-619(a)(9) of the Code. Defendants asserted the business judgment rule as an affirmative matter to defeat plaintiff's claims. They supported this defense with an affidavit from Lee, First Vice President at First American Bank, detailing the facts articulated above as related to defendants' actions taken up until the sale of the building's remaining interest to Northhampton in 2014.

---

[2] Only counts 1-3 and 14-17 are relevant to this appeal. Counts 4-13 were previously dismissed with prejudice and repleaded in the second amended complaint for the purpose of preserving any appeal rights. However, plaintiff did not appeal counts 4-13.

¶ 18    Plaintiff filed two verifications in response to defendants' motion to dismiss and Lee's affidavit, as well as a March 15, 2022, transcript of Lee's deposition. The verifications were from Braeside President David Multack and plaintiff's board president Ken Campbell. Multack's verification contained a series of assertions that from the date that Braeside started acting as the Association's property manager, Braeside was never provided any communications or documents from Wiss Janney or Novak. Campbell's verification detailed his familiarity with the BRI Reserve Study, the Wiss Janney reports and communications, and the costs incurred for repairs since Northhampton's purchase of the building in 2014. Lee's March 15, 2022, deposition testimony wherein he recalled having "no thought to whether [fixing the water leaks] was long or short term." He just wanted to "[f]ix the problem." When asked what his goal was in 2009 regarding the water leaks, Lee responded that "[w]e wanted the building to stop leaking *** permanently, forever." Much of the remainder of his testimony consisted of his failure to recall specific details about communications with Wiss Janney and Novak.

¶ 19    On February 7, 2023, the trial court issued its memorandum order granting defendants' motion to dismiss, with prejudice, finding that the business judgment rule served as an affirmative matter to defeat plaintiff's claims. Further, the trial court found that plaintiff failed to rebut defendants' evidence that the business judgment rule barred its claims. Finally, the trial court found that the record was devoid of any evidence to support plaintiff's fraud claims.

¶ 20    Plaintiff then timely filed this appeal.

¶ 21                                        II. ANALYSIS

¶ 22    In this appeal, plaintiff contends that the trial court erred in dismissing its complaint pursuant to section 2-619(a)(9) of the Code. It argues that the trial court (1) improperly considered defendants' argument as to the business judgment rule as an affirmative matter; (2) erred in finding

- 12 -

that defendants' section 2-619(a)(9) motion conclusively defeated the facts articulated in plaintiff's complaint; (3) incorrectly concluded that plaintiff failed to rebut defendant's evidence that the business judgment rule barred its claims; and (4) abused its discretion in granting defendant's motion to dismiss plaintiff's second amended complaint with prejudice. We address each of plaintiff's arguments in turn.

¶ 23    Our standard of review of a motion to dismiss under section 2–619 of the Code is *de novo*. *Krilich v. American Nat. Bank and Trust Co. of Chicago*, 334 Ill. App. 3d 563, 569 (2002). A section 2–619 motion to dismiss admits the legal sufficiency of the complaint and raises defects, defenses, or other affirmative matters that appear on the face of the complaint or are established by external submissions that act to defeat the claim. *Krilich*, 334 Ill. App. 3d at 569-70.

¶ 24    A section 2–619 proceeding permits a dismissal after the trial court considers issues of law or easily proved issues of fact. *Krilich*, 334 Ill. App. 3d at 570. Section 2–619(a)(9), as asserted by the defendants in the present case, allows dismissal when "the claim asserted *** is barred by other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2–619(a)(9) (West 2020). The term "affirmative matter" as used in section 2–619(a)(9) has been defined as a type of defense that either negates an alleged cause of action completely or refutes crucial conclusions of law or conclusions of material fact unsupported by allegations of specific fact contained in or inferred from the complaint. *Krilich*, 334 Ill. App. 3d at 570.

¶ 25    In ruling on a motion to dismiss under section 2–619(a)(9), the trial court may consider pleadings, depositions, and affidavits supporting a defendant's assertion of an affirmative matter, if such a matter is not apparent on the face of the complaint. *Epstein v. Chicago Board of Education*, 178 Ill. 2d 370, 383 (1997). The burden then shifts to the plaintiff, who must establish that the affirmative defense asserted either is "unfounded or requires the resolution of an essential

element of material fact before it is proven." *Epstein*, 178 Ill. 2d at 383, quoting *Kedzie &103rd Currency Exchange, Inc.*, 156 Ill. 2d 112, 116 (1993). The plaintiff may establish this by presenting "affidavits or other proof." 735 ILCS 5/2–619(c) (West 2018). "If, after considering the pleadings and affidavits, the trial judge finds that the plaintiff has failed to carry the shifted burden of going forward, the motion may be granted, and the cause of action dismissed." *Kedzie & 103rd Currency Exchange, Inc.,* 156 Ill. 2d at 116.

¶ 26    We begin our analysis with plaintiff's argument that the trial court improperly considered defendants' assertion of the business judgment rule as an affirmative matter to defeat the claims in its complaint. This argument is misguided as the business judgement rule is an affirmative matter falling within the scope of section 2-619(a)(9) of the Code. See *Miller v. Thomas*, 275 Ill. App. 3d 779, 789-90 (1995). "The business judgment rule shields directors who have been diligent and careful in performing their duties from liability for honest errors or mistakes in judgment." *Id*. at 788. Provided that the defendants exercised "due care, adequate information, and good faith in making business decisions," the business judgment rule would "fully protect" defendants' decisions as to how they address certain water leakage and window defects in the building. *Id*. Defendant's motion to dismiss the complaint pursuant to section 2-619(a)(9) and the supporting affidavit from Lee invoking the business judgment rule were wholly proper and the trial court did not err in its consideration.

¶ 27    Plaintiff next argues that the trial court erred in finding that defendants' section 2-619(a)(9) motion conclusively defeated the facts articulated in plaintiff's complaint. Plaintiff asserts that Lee, Olsen, Berton, and later Heitkemper, as employees of First American Bank and members of the Fountain Square on the River Condominium Association board, breached their fiduciary duties to plaintiff by failing to inform about the building's defects and set aside adequate reserves to

account for the future financial needs of plaintiff. Plaintiff alleged that defendants concealed the defects in order to profit from the sale of the building to Northhampton by withholding the existence and extent of the defects. As the well-pled allegations in the complaint must be taken as true, plaintiff argues, the business judgment rule and Lee's affidavit failed to "eviscerate" plaintiff's allegations.

¶ 28    The business judgment rule acts to shield directors who have been diligent and careful in performing their duties from liability for honest errors or mistakes of judgment. *Stamp v. Touche Ross & Co.*, 263 Ill. App. 3d 1010, 1015 (1993). Under the business judgment rule, the judgment of the corporate board enjoys the benefit of a presumption that it was formed in good faith and was designed to promote the best interests of the corporation they serve. *Id*. Absent bad faith, fraud, illegality or gross overreaching, courts will not interfere with the exercise of business judgment by corporate directors. *Henderson Square Condominium Ass'n v. LAB Townhomes*, LLC, 2015 IL 118139, ¶ 77. The business judgment rule comes into effect when mismanagement is the gravamen of the cause of action. *Willmschen v. Trinity Lakes Improvement Ass'n*, 362 Ill. App. 3d 546, 550 (2005).

¶ 29    Common to all plaintiff's allegations of breach of fiduciary duty against defendants are failure to properly address claims of water leakage and failure to establish a plan to keep enough financial reserves to fund future repairs to the building. As to the water leaks, the Lee affidavit shows that defendants consulted with Wiss Janney and its project manager, Godfryt, to determine whether Novak met the terms required in the settlement agreement in order to release the final installment payment. From June 23, 2009, through December 21, 2009, the record shows, and indeed Lee's affidavit recites, that defendants relied on Wiss Janney's recommendations as to how the water leaks repairs should proceed. On December 21, 2009, Godfryt wrote to Lee that "all

active leaks have been addressed, Per the repairs and re-testing recently performed by Novak Construction, all windows at the "07" and "08" units, as well as the window at 702 east now appear to demonstrate watertight performance. The corrective work attributed to previous exterior sealant and window deficiencies at Fountain Square appears to now provide watertight performance. We consider our role in this project now complete." Defendant reasonably relied on Wiss Janney's unqualified certification that the issues with water leakage had been remedied. Even though plaintiff argues here that Wiss Janney made recommendations that all windows be replaced in its September 2, 2009, report, that does not undermine defendants' reliance on the business judgment rule for electing to proceed with the alternative approach of sealant repairs to the windows. See *Stamp*, 263 Ill. App. 3d at 1017 (a complaint that second guesses defendants' decisions are what the business judgement rule was designed to preclude).

¶ 30    Plaintiff cites *Kai v. Spring Hill Building 1 Condominium Assoc, Inc.*, 2020 IL App (2d) 190642, for the proposition that any allegation of bad faith, fraud, illegality or gross overreaching is sufficient to survive a motion to dismiss pursuant to section 2-619 of the Code. However, *Kai* is distinguishable from the present case. In *Kai*, plaintiffs filed a four-count complaint alleging breach of fiduciary duty, constructive fraud, recission, and civil conspiracy against the defendants, condominium association board of directors, for forcing the bulk sale of condominium units to a buyer controlled by board members on terms that allegedly disadvantaged minority owners. *Id*. ¶ 11.

¶ 31    The *Kai* defendants filed a motion to dismiss pursuant to section 2-619 of the Code, arguing that plaintiffs could not assert their claims because the procedure in section 15 of the Condominium Property Act (Act) (765 ILCS 605/15 (West 2018)) was the sole remedy available to minority unit owners in the event of a bulk sale, regardless of whether there was any breach of fiduciary duty in

the transaction. *Id*. ¶ 12. Additionally, as can be found in the *Kai* record, defendants argued in their motion that the business judgment rule precluded plaintiff's breach of fiduciary duty claim because defendants relied on advice of legal counsel that a majority owner has the right to utilize section 15 of the Act to force the sale of an association. That claim was not supported by affidavit.

¶ 32    The trial court granted defendants' motion to dismiss finding that plaintiffs could not assert a claim for breach of fiduciary duty because their sole remedy against misconduct during a forced bulk sale of condominiums, regardless of whether that misconduct also violated fiduciary duties, was the procedure in section 15 of the Act. *Id*. The trial court's finding was devoid of any mention of the business judgment rule.

¶ 33    In reversing the trial court, this court held that section 15 of the Act expressed no legislative intent to alter the common law of fiduciary duties. *Id*. ¶ 19. This court cited section 18.4 of the Act which imposes a fiduciary duty on members of the boards that govern condominium associations. "In light of section 18.4's express imposition of fiduciary duties upon association board members such as the [defendants], and section 15's lack of any explicit abrogation of those duties in a bulk sale, we conclude that the common law of fiduciary duty remains in full force and applies to the bulk sale of condominiums under section 15." *Id*. As to defendants' assertion that the business judgment rule protected their actions from claims of breach of fiduciary duty, this court stated that "the plaintiffs alleged that the defendants engaged in *** bad faith and fraud, and their allegations must be taken as true at this stage of the case *** [t]hus, the business judgment rule does not support dismissal of the complaint." *Id*. ¶ 24.

¶ 34    Unlike in the present case, the defendants in *Kai* based the entirety of their business judgment rule assertion on having been legally advised on the strictures of section 15 of the Act. Here, defendants asserted the business judgment rule and supported it with the Lee affidavit and

voluminous other documentation to show that due care was applied in making the decisions plaintiffs challenged in their second amended complaint. When a defendant satisfies its initial burden of going forward with a defense under section 2–619(a)(9), the burden shifts to the plaintiff to establish that the defense is unfounded. *Kedzie,* 156 Ill. 2d at 116, 189.

¶ 35    In this case, the Lee affidavit supported the business judgment rule defense, and the evidentiary facts of the affidavit are deemed admitted under section 2–619 if a counteraffidavit has not refuted them. *Kedzie,* 156 Ill. 2d at 116. When a defense bars a complaint on its face, the plaintiff waives any exception to the defense which he does not assert by amending the complaint. *Miller v. Thomas*, 275 Ill. App. 3d 779 (1995). As we will discuss in detail below, plaintiff's counteraffidavits did not refute the Lee affidavit's support for defendants' assertion of the business judgment rule as a bar to the claims at issue.

¶ 36    Plaintiff further argues that Lee's affidavit reveals defendants' conflict of interest and First American Bank's financial motive. Plaintiff claims that, as members of the First American Bank and Turnover Boards, Lee, Olsen, Berton, and Heitkemper had dual duties of loyalty and care in the execution of their duties. However, plaintiff's complaint never pleads conflict of interest. Indeed, the term "conflict of interest" only appears in plaintiff's response to defendants' motion to dismiss where it states that "The Bank was in a conflict of interest and failed to exercise due care when making decisions about how to resolve the water infiltration problems at the Assocation[.]"

¶ 37    Without alleging a conflict of interest in the complaint, the matter was never properly before the trial court. This explains why the trial court never mentions a conflict of interest in its findings. While it is true that dual memberships on boards of directors of competing or potentially competing businesses may create a conflict of interest thereby breaching fiduciary duty, First American Bank and the respective Boards are not competing or potentially competing businesses.

The interests of First American Bank and the Boards do not conflict. See *Borgsmiller v. Burroghs*, 187 Ill. App. 3d 1, 6 (1989). Further, the record shows that First American Bank created AREI specifically to separate itself from potential conflicts, presumably to avoid the appearance of impropriety or conflict of interest.

¶ 38    Plaintiff's complaint makes the wholly speculative and conclusory assertions that defendants' failures and omissions were "implemented for the purpose of maximizing AREI's and First American Bank's profits in the development and sale of the Complex and units in the Association and to avoid their share of assessment responsibility for reserves and repairs, all to the detriment of the Association." We do not need to take such assertions as true at this stage of the litigation. A motion to dismiss under section 2-619 admits well-pleaded facts but does not admit conclusions of law and conclusory factual allegations unsupported by allegations of specific facts alleged in the complaint. *McIntosh v. Walgreens Boots Alliance, Inc*., 2019 IL 123626, ¶ 16. In addition, a defendant does not admit the truth of any allegations in the complaint that may touch on the affirmative matters raised in a section 2-619(a)(9) motion to dismiss. *Id.* In any event, as plaintiff did not raise this issue in its complaint, it was never properly before the trial court and, therefore, is forfeited. *In re Marriage of Andres*, 2021 IL App (2d) 191146, ¶ 72.

¶ 39    As to plaintiff's financial reserves, the Lee affidavit shows that the board approved BRI's retention to inspect and assess the building. In 2010, BRI provided a detailed report that outlined necessary and appropriate reserves. As part of that report, BRI inspected the entire property, including the balconies, doors, roof, sealants, windows, and exterior façade. Based on the inspection, the report concluded that financial reserves would be adequate until 2027. The report further anticipated that the sealants, windows, doors, and exterior façade would need a full replacement in 2017. Plaintiff asserts that BRI was not provided with Wiss Janney's 2009 reports

but does not show how those reports would have affected BRI's inspection findings and report. At the time of the building's sale to Northhampton in 2014, the Association had over $300,000 in reserves, a full 13 years before the BRI report anticipated a budget shortfall. As with plaintiff's claims about the water leaks, defendants' reliance on the BRI report are protected by the business judgment rule. See *Stamp*, 263 Ill. App. 3d at 1017.

¶ 40 We next examine plaintiff's argument that the trial court incorrectly concluded that plaintiff failed to rebut defendant's evidence that the business judgment rule barred its claims. Plaintiff argues that the March 15, 2022, deposition testimony of Lee and verifications from David Multack and Kenneth Campbell attached to its response to defendant's motion to dismiss evidenced defendants' "wrongdoing, motive, and *** ill intent," and demonstrates plaintiff's rebuttal of defendants' business judgment rule defense.

¶ 41 Illinois Supreme Court Rule 191(a) states, in part, as follows:

> "[A]ffidavits submitted in connection with a motion for involuntary dismissal under section 2-619 of the Code *** shall be made on the personal knowledge of the affiants; shall set forth with particularity the facts upon which the claim, counterclaim, or defense is based; shall have attached thereto sworn or certified copies of all documents upon which the affiant relies; shall not consist of conclusions but of facts admissible in evidence; and shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto." IL. S. Ct. R. 191(a) (eff. Jan 4, 2013).

¶ 42 Both the Multack and Cambell verifications fail to rebut defendants' invocation of the business judgment rule. Aside from their assertions that they would be willing to testify to the facts contained therein, the verifications merely state that they are either aware of the facts in Lee's affidavit regarding communications and documents from Wiss Janney and BRI or, in Multack's

case, that communications and documents from Wiss Janney were never provided. Campbell's verification never asserts his experience or knowledge with water leaks, sealants, or any other type of building maintenance. He avers that the 2009 sealant repairs were a "stop gap" measure taken by defendants but never articulates a basis for this assertion.

¶ 43 Lee's deposition testimony only supports defendants' business judgment rule defense as he testified that his goal was to permanently stop the water leaks. As far as his inability to recall certain details of communications made in 2009 during his 2022 deposition, we cannot agree that this defeats his affidavit's assertion that defendants were adequately informed during the time of both the Wiss Janney communications and the issuance of the BRI Reserve Study. Because Multack and Campbell's verifications were wholly conclusory and contained no new facts or evidence regarding either the water leaks or financial reserves, the trial court's finding that plaintiff failed to rebut defendants' invocation of the business judgement rule was not error.

¶ 44 As stated above (*supra* ¶ 16) the breach of fiduciary duty counts in plaintiff's complaint also alleged constructive fraud. Constructive fraud springs from the breach of a fiduciary duty. *La Salle National Trust, N.A. v. Board of Directors of the 1100 Lake Shore Drive Condominium,* 287 Ill. App. 3d 449, 455 (1997). The elements of constructive fraud are: (1) a fiduciary relationship; (2) a breach of the duties that are imposed as a matter of law because of that relationship; and (3) damages. *Kovac,* 2014 IL App (2d) 121100, ¶ 64. However, when a board properly exercises its business judgment in interpreting its own declaration, we will not find the board's interpretation to be a breach of fiduciary duty. *Carney v. Donley*, 261 Ill. App. 3d 1002, 1011 (1994). Based on our holding that defendants' affirmative defense of the business judgment rule serves to defeat the claims of breach of fiduciary duty, the constructive fraud claims must necessarily fail as plaintiff cannot establish the second element of such a claim.

¶ 45    Plaintiff's remaining claims were that defendants violated the Illinois Consumer Fraud Act (815 ILCS 505/2 (West 2018)) and committed common law fraud by failing to set adequate reserves for the building's repairs. To adequately plead a private cause of action for a violation of section 2 of the Illinois Consumer Fraud Act, a plaintiff must allege (1) a deceptive act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deception; (3) the deception occurred in the course of conduct involving trade or commerce; (4) actual damage to the plaintiff; and (5) such damages were proximately caused by the deception. *Oliveira v. Amoco Oil Co.,* 201 Ill. 2d 134, 149 (2002). The elements of common-law fraud are: (1) a false statement of a material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement. *Connick v. Suzuki Motor Co.,* 174 Ill. 2d 482, 496 (1996).

¶ 46    To properly allege that a practice is deceptive or unfair under the Illinois Consumer Fraud Act, a plaintiff must plead that the practice (1) offends public policy; (2) is immoral, unethical, oppressive, or unscrupulous; and (3) causes substantial injury to consumers. In the present case, the record contains no evidence of any deceptive act or practice. Further, there is no evidence in the record that defendants made any type of statement at all to plaintiff, much less one that was known to be false and intended to induce plaintiff to act.

¶ 47                                III. CONCLUSION

¶ 48    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 49    Affirmed.

¶ 50    JUSTICE KENNEDY, dissenting.

¶ 51    I disagree with the majority's application of the business judgment rule under these circumstances. "Under the business judgment rule, in the *absence of bad faith, fraud*, illegality or gross overreaching, courts will not interfere with the exercise of business judgment by corporate directors." (Emphasis added.) *Henderson Square Condominium Ass'n v. LAB Townhomes, LLC*, 2015 IL 118139, ¶ 77. Here, counts I-III and XIV-XV allege breach of fiduciary duty and also explicitly allege that the breach was intentional, amounted to willful misconduct, and was undertaken in bad faith. Likewise counts XVI and XVII sound in consumer fraud and fraudulent concealment. As such, application of the business judgment rule is inappropriate. See *Kai v. Board of Directors of Spring Hill Building 1 Condominium Ass'n, Inc.*, 2020 IL App (2d) 19064 ¶ 28 (holding that the business judgment rule does not support dismissal of claims sounding in bad faith and fraud at the pleadings stage where such allegations must be taken as true).

¶ 52    Additionally, I disagree with the majority's assessment that plaintiff's allegations of fraud and bad faith are wholly speculative or conclusory. The complaint alleged that defendants for their own gain and that of their employer declined to investigate and refused to properly resolve the water infiltration problems, knew that the solution of applying sealant rather than addressing the underlying cause of the leaks would increase maintenance costs over the life of the building, withheld information from the new board about the latent defects, and failed to inform the firm that performed the reserve study of the defects, leading to an inadequate reserve fund. The complaint further alleged that Lee and the other board members, as employees of the bank, were motivated in their actions to maximize the bank's profits to the detriment of the owners and plaintiff. Taken as a whole, plaintiff has pled sufficient facts to state a cause of action.

¶ 53    I also disagree with the majority's finding that the affidavit is sufficient to defeat plaintiff's claims. Even accepting the statement in Lee's affidavit as true, it notably says nothing about the

reserve study or what information the firm performing the study received. Likewise, it is silent regarding the decision to utilize sealant rather than correct the underlying cause of the building's leaks. More importantly, Lee's affidavit fails to state that the incoming board members or unit owners were ever informed about the building's defects, a key fact supporting plaintiff's claims that the bank's board intentionally withheld information in order to pass the buck to the unit owners.

¶ 54 Further, while Lee's affidavit states that he relied on the "unqualified certification from WJE that the causes of water infiltration in the building had been corrected[,]" WJE notably would not endorse the solution of using sealant to remedy the leaks.

¶ 55 As such, there are many unresolved factual issues, which preclude dismissal at the pleadings stage. See *Henderson Square Condominium. Ass'n v. LAB Townhomes, LLC*, 2015 IL 118139, ¶ 79 (rejecting application of business judgment rule to dismiss a claim for breach of fiduciary duty based on fraud and bad faith where questions of fact exist).

¶ 56 For the foregoing reasons, I respectfully dissent.